UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br><br>        v.<br><br>JESUS ANTONIO DIAZ-FLORES,<br><br>                                    Defendant. | Case No. 2:15-cr-00114-APG-PAL<br><br>REPORT OF FINDINGS AND<br>RECOMMENDATION<br><br>(Mot. Suppress – Dkt. #17) |

Before the court is Defendant's Motion to Suppress Evidence for Fourth Amendment Violations (Dkt. #17) which was referred to the undersigned for a Report of Findings of Recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4. The court has considered the Motion, the United States' Opposition (Dkt. #19), and evidence adduced at an evidentiary hearing held on August 4, 2015. Monique Kirtley appeared on behalf of the Defendant and Susan Cushman appeared on behalf of the Government.

The government called the two Nevada Highway Patrol ("NHP") officers who initiated the traffic stop involved in this case, and was prepared to call the K-9 unit officer who deployed the drug sniffing dog. However, counsel for Defendant indicated that she had just received the K-9 training and certification documents from a subpoena duces tecum served on NHP and had not had an adequate opportunity to review them. She requested a two-week continuance for this purpose. The court left the evidentiary hearing open and set the matter for a status check on August 20, 2015. At the status hearing, counsel for Diaz-Flores advised the court that she was withdrawing that portion of her motion seeking an evidentiary to test the reliability of the dog. The government rested and Defendant rested. Diaz-Flores was canvassed and acknowledged he understood he had the right to testify or not and had decided not to testify after conferring with counsel.

1

## BACKGROUND

2   Jesus Antonio Diaz-Flores ("Diaz-Flores") is charged in an Indictment (Dkt. #8) returned

3 April 21, 2015, with conspiracy to distribute a controlled substance in violation of 28 U.S.C. §§

4 846 and 841(a)(1) and (b)(1)(A)(i) and possession with intent to distribute a controlled substance

5 in violation of 28 U.S.C. §§ 841(a)(1) and (b)(1)(A)(i).   The indictment arises out of a traffic

6 stop conducted April 8, 2015 at 17:17 on Interstate 15 by two Nevada Highway Patrol Officers

7 who are members of the Southern Nevada Interdiction Task Force.   Diaz-Flores was pulled over

8 for following too close to a semi-tractor trailer in violation of Nevada Revised Statute ("NRS") §

9 484B.127.   He produced a Mexican passport and driver's license and eventually retrieved

10 paperwork for the car.   Diaz-Flores was detained at the scene while Trooper Mermini conducted

11 a records check which revealed the license plate did not match the vehicle.

12   The entire encounter was recorded on Trooper Mermini's vehicle recording equipment,

13 although Trooper Mermini's body microphone was turned off during portions of the encounter.

14 A copy of the recording was manually filed and attached to the Motion.   Trooper Mermini used a

15 cell phone to call Las Vegas Metropolitan Police Department ("LVMPD") Detective Frampton

16 and requested that he and his narcotics detector dog respond to the scene.   Detective Frampton

17 arrived at 17:26.   Trooper Mermini gave Diaz-Flores a verbal warning for the traffic violation at

18 17:38 and returned the paperwork for the car and driver's license to him, telling him he was free

19 to go.   As Diaz-Flores prepared to walk back to his car, Trooper Mermini asked him if there were

20 any guns, bombs, or drugs in the car.   Diaz-Flores denied that there were.   Trooper Mermini

21 asked for permission to search Diaz-Flores' car.   Diaz-Flores agreed and signed a written consent

22 to search.   He signed it at 17:39, 22 minutes after the traffic stop.   Diaz-Flores was asked to stand

23 about 20 feet away from the car while Detective Frampton deployed his dog, Mato.

24   The dog alerted to the back seat under a cargo area at 17:43.   Detective Frampton

25 removed a black suitcase, small beanbag chair, and a 3-inch diameter black PVC pipe from the

26 cargo area.   The PVC pipe was capped at one end and had duct taped bundles stuffed inside,

27 greased to fit the pipe.   Mermini removed four duct taped bundles from the pipe and another

28

silver duct taped package from inside the beanbag chair.  The contents of the packages field

tested positive for heroin and Diaz-Flores was placed under arrest at 17:48.

In the current Motion, Diaz-Flores seeks to suppress evidence recovered from the stop

arguing the traffic stop was conducted without probable cause.  The motion claims that Diaz-

Flores denies that he was travelling approximately 70 mph or that he was following too close to

the semi in front of him.  NRS 484B.127 prohibits a driver of a vehicle from following another

vehicle "more closely than is reasonable and prudent, having due regard for the speed of such

vehicles and the traffic upon and the condition of the highway."  Video from the dash cam and

Trooper Mermini's vehicle shows that Diaz-Flores was following the semi in a reasonable and

safe manner.

Diaz-Flores also argues that the stop was unreasonably prolonged, and took longer than

necessary to effectuate its initial purpose.  Trooper Mermini lacked reasonable suspicion to

believe Diaz-Flores was engaged in criminal activity.  He delayed returning Diaz-Flores'

paperwork and license to him until after Detective Frampton and the canine arrived at the scene.

Trooper Mermini also asked Diaz-Flores questions not related to the stop.  Diaz-Flores asserts

that his consent to search was a result of coercion and duress and tainted by the long detention at

the scene.  The motion emphasizes that the consent to search form was signed in English and

Diaz-Flores is not a native English speaker.  Finally, Diaz-Flores argues although a dog sniff

alone can supply probable cause to search, the Supreme Court recently stressed that a person

accused of having illegal drugs based on a dog's alert must have an opportunity in court to

challenge the dependability of the training evidence, and test whether the police handler may

have "cued" the dog to make an alert.  He initially sought an evidentiary hearing for this purpose,

but after receiving documents he subpoenaed, withdrew that portion of his motion.

The Government opposes the motion arguing the stop was supported by probable cause

to believe a traffic violation had occurred, the length and scope of the traffic investigation was

lawful, any prolonged detention was supported by Trooper Mermini's reasonable suspicion that

Diaz-Flores was engaged in illegal activity, Diaz-Flores voluntarily consented to a search of his

car, and the canine alert provided probable cause to search the car.

3

**EVIDENTIARY HEARING TESTIMONY**

I.      **Testimony of Trooper Al Mermini**

Trooper Mermini testified that he has been employed by the Nevada Highway Patrol for almost five years, and is assigned to the Southern Nevada Interdiction Task Force ("SNITF"). On April 8, 2015 he was working with Sargent Anthony Munoz on patrol on Interstate 15.  He and Munoz were parked along the Interstate facing eastbound at mile marker 56 when he observed a black Chevy with South Carolina plates pass.  The vehicle was in the number two lane.  It was dusty and dirty and the driver had his hands in the "ten-two" position and pushed himself behind the "B port" (phonetic) as he passed the patrol car.  As the vehicle passed, Mermini also observed it had many fingerprints on the rear cargo latch indicating to him that numerous trips had been made to the rear cargo area.  The car "piqued" his interest and he decided to follow it.  While following the vehicle he observed the car following a large semi-truck in the number two travel lane at an unsafe distance.  The black Chevy was not going around the semi, like most people would do, although there was a passing lane and there was no traffic preventing him from doing so.  Mermini believed the Chevy was travelling so closely to the semi that it was in the semi's blind spot, and therefore following at an unreasonable and unsafe distance.  The black Chevy was travelling approximately 70 mph in a 75 mph speed zone.

Trooper Mermini followed the vehicle for approximately 4 miles until pulling him over at mile marker 60 which is an area he frequently uses because he considers it safer for traffic stops.  The dash cam on the patrol vehicle was activated 30 seconds prior to activation of the patrol vehicle's lights and sirens.

He parked behind the black Chevy and approached the driver on the passenger's side. Sargent Munoz stood behind him.  Mermini asked the driver for driver's license, registration and insurance.  The driver spoke to him in English and appeared to understand English.  The driver did not have a U.S. driver's license but did have a Mexican passport and Mexican driver's license.  Mermini identified the driver of the car as the Defendant, Diaz-Flores.

Diaz-Flores said that he did not have insurance or registration for the vehicle.  He initially claimed he had no paperwork for the car, and said it belonged to a friend.  When asked

the name of the friend he could not provide a name after a long delay.  Diaz-Flores later said he had recently bought the car.  This made Trooper Mermini suspicious the car might be stolen.  The vehicle had a single key and multiple cell phones in the interior of the vehicle.  Diaz-Flores was nervous and fidgeting and, when asked why he was so nervous, claimed it was because he had a fight with his wife.  Mermini saw he was on the phone and saw another cell phone in the car.  Mermini asked Diaz-Flores where he was coming from and going to and Diaz-Flores responded he was coming from Amargosa and returning Amargosa and then stated he was going to South Carolina.

Mermini asked Diaz-Flores to step out of the car.  Diaz-Flores said paperwork for the vehicle was in the back cargo area.  Diaz-Flores left the driver's side door open as he left, exposing it to traffic, indicating to Mermini that he was nervous.  Mermini told him to shut the door so the door did not get ripped off and Diaz-Flores retrieved the paperwork from the cargo area of the vehicle.  Mermini identified Exhibits 3A through 3E as photocopies of the paperwork Diaz-Flores gave him which were marked and admitted into evidence.  The passport and Mexican Driver's License that Diaz-Flores provided had his name on them, however, paperwork for the car did not indicate that he was the owner.

Mermini went to the patrol car to begin his investigation.  He asked Diaz-Flores to stand at the right front of the patrol car and said that he needed the paperwork for the vehicle.  Mermini made a phone call to another Task Force member, Detective Jake Frampton with the Henderson Police Department, in the K-9 Unit at 17:22 and asked him to head to the scene as Mermini felt the totality of the circumstances warranted it.  Mermini muted his body microphone while communicating with Detective Frampton.  After that he spoke with a law enforcement data base after looking closer at the paperwork Diaz-Flores provided.  Mermini put his body microphone audio back on at approximately 17:23.  He asked Diaz-Flores, who was standing in front of the open door of the patrol car with Sargent Munoz, who owned the car.  Diaz-Flores said the dealer owned the car.  Mermini called Detective Sandoval, a LVMPD Task Force member, telling him where he was and said "Sandoval, I've got a case."

1  Mermini called the El Paso Intelligence Center ("EPIC") and learned that Diaz-Flores
2  had been previously deported in 2013.  He also learned that the license plate on the black Chevy
3  did not belong to the car.  In the meantime, Diaz-Flores had spoken with Sargent Munoz and told
4  Munoz that the plates on the car belonged to Diaz-Flores' 1978 Camaro.  Diaz-Flores told
5  Munoz who told Mermini that he had placed the license plates from his Camaro on the vehicle
6  because the Chevy was not registered.

7  Detective Frampton arrived at approximately 17:27.  Mermini spoke with Frampton
8  while his body microphone audio was off about how he planned on proceeding.  Detective
9  Frampton's dog, Mato, was still in the cage of Detective Frampton's vehicle.

10  At 17:38 after receiving the report from EPIC, Mermini told Diaz-Flores that he
11  would be given a warning instead of a ticket and returned his paperwork to him.  As Diaz-Flores
12  started to leave, Mermini asked whether Diaz-Flores had any guns, bombs, explosives or
13  narcotics in the car.  Diaz-Flores denied contraband was in the car.  Mermini observed he was
14  violently trembling.  Mermini asked Diaz-Flores if it was okay to search the vehicle.  Diaz-
15  Flores verbally agreed and was handed an already filled out NHP written consent to search form.
16  Mermini asked Diaz-Flores to read each line of the form to him out loud.  When Diaz-Flores did
17  not do so, Mermini read the form verbatim to him.  A copy of the written consent form was
18  marked and admitted as Exhibit 4.  Mermini testified that he spoke with Diaz-Flores in English
19  the entire time, and had no problem communicating with him.  Diaz-Flores also spoke with
20  Sargent Munoz in English.  Diaz-Flores indicated he understood the form.  However, he did ask
21  about the request to search "luggage".  Mermini told him "luggage" meant "baggage".  Mermini
22  asked Diaz-Flores if he understood.  Diaz-Flores said he did.  Mermini told Diaz-Flores to sign if
23  he consented to search, and the form was signed at approximately 17:39.

24  Mermini and Munoz cleared the car to make sure there were no objects that would
25  hurt the canine.  The canine conducted the search and alerted.  6.2 pounds of heroin were
26  recovered from a black PVC pipe in the rear cargo behind the suitcase and in a beanbag-type
27  chair which tested positive for heroin.

28

On cross-examination Mermini testified that the video of the stop starts at 17:16:24 and Diaz-Flores was pulled over at 17:17:05 at mile marker 60.  Mermini called the stop out to dispatch and called in the plates.  The purpose of providing the plate number of the vehicle he was stopping to dispatch was so that if anything happened during the traffic stop, other officers would know where he was.  He was not asking dispatch to run a records check on the license plates.  Mermini testified he told Diaz-Flores he had been stopped for following too close and then asked for driver's license and registration.  Diaz-Flores was very cooperative and responsive to questions.  Mermini was asked about the reasons he stopped the Chevy.  He testified he stopped the vehicle because the car was dirty and dusty indicating it had travelled some distance. He acknowledged it was in the desert and this was not unusual in and of itself.  It is also not suspicious in and of itself for fingerprints to be on the cargo area of a vehicle.  With respect to Diaz-Flores pushing back behind the "B port" as the car passed the patrol car, Mermini acknowledged that someone could have straightened and then pushed back to stretch.  Following too close is a violation for NRS 484B.127.  He estimated that Diaz-Flores was following approximately two car lengths behind the semi which was too close, based on his training and experience to be reasonable and prudent travelling 70 mph.

Diaz-Flores was nervous.  When asked why he was so nervous Diaz-Flores responded that he was in an argument with his wife.  Mermini saw Diaz-Flores on the phone and asked him to call his wife back.  Diaz-Flores eventually provided a bill of sale for the vehicle.  Mermini had Diaz-Flores stand at the front of the patrol car while he made his phone call to Detective Frampton, turning his body microphone off.

Mermini remained in his patrol car while he called Detective Frampton and the EPIC records check center.  From reviewing the video he agreed that he filled out the consent to search form between 17:25:38 to approximately 17:26:49.  It took some time to get the results of his records request from EPIC.  When Mermini finally received the information from EPIC he got out of the car at 17:38:32 and handed Diaz-Flores his paperwork telling him he would receive a warning instead of a ticket.  Mermini asked questions about drugs in the vehicle after the conclusion of the traffic stop.

7

EPIC gave Mermini information about Diaz-Flores' border crossing and that the vehicle was "cold-plated", meaning it belonged to a 1978 Camaro, not the black Chevy.  EPIC also advised Mermini  that the black Chevy was not stolen.

## II.      Testimony of Anthony Munoz

Munoz has been an NHP officer for ten years and a Sargent for approximately 4 ½ years. He has been Mermini's supervisor for approximately five months and is also assigned to the Task Force.  On April 8, 2015 he was riding with Mermini.  At the time, Munoz was new to the Task Force and wanted to get to know everyone.  He acted as Mermini's cover officer during the stop.  Munoz spoke with Diaz-Flores off microphone in English.  The patrol car was only equipped with one body microphone worn on Mermini's lapel.

Munoz generally discussed Diaz-Flores' travel plans, where he was coming from and going to.  Diaz-Flores told him he was going to South Carolina after visiting Amargosa where his sister lived.  He intended to sell the vehicle to his sister who decided she did not want to buy it and was going back to South Carolina.  Diaz-Flores told Munoz that he did upholstery work in South Carolina.  The two engaged in small talk.  Diaz-Flores also told Munoz that the plates on the Chevy belonged to his Camaro and that he had put the plates on the Chevy because it was not registered.  Munoz checked the VIN on the car, according to the dash cam video, at 17:30:33.

Once the consent to search was signed Munoz stayed with Diaz-Flores in the desert while the car was searched.  During this time the conversation was minimal.  Munoz recalled that Diaz-Flores turned, put his head down, and slumped after the consent was given.  At no point did Diaz-Flores revoke consent.  All of his conversations with Diaz-Flores were in English and Munoz had no issues at all communicating with him.

On cross-examination, Munoz testified that Diaz-Flores cooperated throughout the encounter.  The officers had no information that there were any outstanding warrants for Diaz-Flores, or a report that the vehicle was stolen.

/ / /

/ / /

/ / /

## DISCUSSION

**I.      The Traffic Stop**

A temporary detention of and individual during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The Fourth Amendment requires reasonable suspicion to justify a traffic stop. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). The reasonable suspicion standard takes into account "the totality of the circumstances—the whole picture." *Id.,* at 417. This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

As long as there is an objectively reasonable basis to perform a traffic stop, the stop will be permitted by the Fourth Amendment. *Whren* at 813. A traffic violation is sufficient to justify an investigatory stop, even if the violation was merely pretextual, *Id.,* at 811-12, the stop departed from the regular practice of a particular precinct, *Id.* at 814-15, or the violation was common and insignificant, *Id.,* at 18-19. If police have reasonable suspicion to believe a violation of a traffic code has occurred, the stop is reasonable under the Fourth Amendment and evidence recovered from a stop is admissible. *United States v. Choudhry*, 461 F.3d 1097, 1102 (9th Cir. 2006).

The court finds that the traffic stop in this case complied with the Fourth Amendment because, under the totality of the circumstances, the officers had at least reasonable suspicion that Diaz-Flores was following the semi-truck in front of him more closely than was reasonable and prudent, having due regard for the speed of the vehicles and the traffic on I-15 at the time of the stop. The officers' testimony and the dash-cam video confirm that Diaz-Flores was following the semi-truck less than two car lengths behind in the number two travel lane. Mermini testified that he followed Diaz-Flores for approximately four miles before pulling him over at a safer section of the highway at mile marker 60. Diaz-Flores was traveling 70 mph.

9

1   Based on Mermini's training and experience, Diaz-Flores was following so close he was in the

2   driver's blind spot.  Additionally, most drivers would pass a semi-truck in a 75 mph zone rather

3   than follow so closely behind.  There was a passing lane available and no traffic was preventing

4   Diaz-Flores from passing the semi-truck.  Under these circumstances, the officers had reasonable

5   suspicion that Diaz-Flores was violating NRS 484B.127 which prohibits a driver of a vehicle

6   from following another vehicle "more closely than is reasonable and prudent, having due regard

7   for the speed of such vehicles and the traffic upon, and the condition of, the highway."

8   **II.     Duration and Scope of the Traffic Stop**

9   The Supreme Court has held that police contact during an investigatory detention must be

10   reasonably related to the circumstances that initially justified the detention.  *United States v.*

11   *Sharpe*, 470 U.S. 675, 682 (1985).  An investigative detention must be tailored to its underlying

12   justification and may last no longer than necessary to effectuate the purpose of the stop.  *Florida*

13   *v. Royer*, 560 U.S. 491, 500 (1983).  However, it is objectively reasonable under the Fourth

14   Amendment to check a motorist's driver's license and registration.  *Id*.  General questioning

15   during a traffic stop concerning the starting point, destination and general travel plans are also

16   objectively reasonable.  *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001).

17   Mere police questioning does not constitute a seizure, and even when officers have no

18   basis for suspecting a particular individual, they may generally ask questions of that individual,

19   ask to examine the individual's identification, and request consent to search.  *Muehler v. Mena*,

20   544 U.S. 93 (2005).  After *Muehler* was decided, the Ninth Circuit recognized that its prior

21   decision in *United States v. Chavez-Valenzuela, supra,* had been overruled, in part, and that

22   police are not required to have reasonable suspicion to ask questions beyond the scope of the

23   initial traffic stop.  *See United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007); *United*

24   *States v. Turbin*, 517 F.3d 1097, 1100 (9th Cir. 2008); *United States v. Mendez*, 476 F.3d 1077,

25   1079-80 (9th Cir. 2007).

26   The court finds that the officers did not violate Diaz-Flores' Fourth Amendment rights by

27   impermissibly expanding the duration and scope of the traffic stop.  Diaz-Flores was detained for

28   approximately twenty-two minutes before giving written consent to search at 17:39.  During that

time, Diaz-Flores was asked for driver's license, registration, proof of insurance, and who owned the vehicle.  He was also asked about his starting point and destination.  He produced a Mexican driver's license and passport in his name.  However, he gave conflicting information about his starting point and destination.  He initially told Mermini that he was coming from Amargosa, and returning to Amargosa.  He later stated he was coming from Amargosa and returning to South Carolina after attempting unsuccessfully to sell the vehicle to his sister.  He gave conflicting stories about the vehicle itself.  He initially told Mermini that the car belonged to a friend.  When asked the name of the friend, he could not provide it after a long delay.  The paperwork for the vehicle he eventually produced did not have his name on it.  Diaz-Flores later said he had recently bought the car.  These statements made Trooper Mermini suspicious that the car might be stolen.

Mermini and Munoz both testified that Diaz-Flores was extremely nervous throughout the encounter.  When Mermini first approached Diaz-Flores, he asked why he was so nervous. Diaz-Flores claimed it was because he was in a fight with his wife.  Mermini saw that Diaz-Flores was on the phone with someone and asked him to call her back.  Diaz-Flores was so nervous that he left the driver's side door open, exposing it to oncoming traffic while retrieving the paperwork.  After receiving the passport, driver's license and paperwork for the vehicle, Mermini went to the patrol car to initiate his investigation.  This initial encounter took approximately five minutes.  Mermini called Task Force Officer Frampton and requested a K-9 Unit at 17:22 while he was in the patrol car to run a records check on Diaz-Flores and the vehicle.  He also called Task Force Detective Sandoval and is audibly heard on the recording telling Sandoval "I've got a case."  Whether or not Mermini believed he had reasonable suspicion that Diaz-Flores was transporting drugs is not relevant to the issues before the court. The Supreme Court has made it clear that an officer's subjective intentions play no role in ordinary Fourth Amendment analysis, and are irrelevant to the court's inquiries concerning the constitutionality of an investigatory detention. *Whren* at 811-13. The question before the court is whether the duration and scope of the stop was objectively reasonable under the totality of the circumstances.  The court finds it was.

Mermini did not get the results from EPIC until 17:38. The two calls to Detectives Frampton and Sandoval lasted less than two minutes and did not unreasonably delay the stop. Diaz-Flores failed to produce insurance or registration for the vehicle.  The paperwork for the vehicle he provided did not have his name on it.  He gave conflicting information about who owned the vehicle, and eventually admitted to Munoz who conveyed the information to Mermini that the vehicle had been "cold-plated", that is, that Diaz-Flores had placed license plates from his 1978 Camaro on the Chevy he was driving at the time of the stop because the Chevy was not registered.  As soon as Mermini learned the information EPIC reported that the vehicle was not stolen, and that the plates on it belonged to a 1978 Camaro and that Diaz-Flores had been previously deported, Mermini got out of his patrol car, handed the paperwork back to Diaz-Flores and told him he was not going to be cited, but given a warning.  The dash cam recording confirms that Mermimi got out of his patrol car at approximately 17:38. The court found Mermini credible that it took a while to get the results of his records request from EPIC, and that as soon as he received the EPIC report, he got out of the car to return the paperwork to Diaz-Flores.

Mermini testified, and the dash-cam video confirms, that Mermini did not ask about drugs or other contraband in the car until Diaz-Flores' paperwork was returned to him.  Mermini testified, and the video recording confirms, that after Diaz-Flores denied he had any drugs or contraband in the car, Mermini asked for consent to search.  Diaz-Flores responded immediately and without hesitation giving verbal consent. He did not express any reservations about the request.  Mermini then handed him a pre filled out consent to search form asking Diaz-Flores to read it out loud.  When Diaz-Flores did not begin reading the form, Mermini read it verbatim to him.  Diaz-Flores asked what the term "luggage" meant, and was told it meant "baggage." Mermini asked Diaz-Flores to sign *if* he consented to the search and Diaz-Flores signed it without hesitation.   The consent to search form was signed at approximately 17:39, approximately one minute after Mermini got out of the patrol car, handed Diaz-Flores the paperwork, and told him he was being given a warning and was free to go.

1     **III.    Consent**

2          A search conducted without a warrant does not offend the Constitution "if conducted

3     pursuant to the voluntary consent of a person in control of the premises."  *United States v.*

4     *Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990).  It is the Government's burden to demonstrate the

5     consent to a warrantless search was voluntary.  *Id*.  Whether consent to search was voluntary and

6     intelligent is a question of fact, and its resolution depends on the totality of the circumstances.

7     *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (citing *Schneckloth v. Bustamont,* 412

8     U.S. 218, 227 (1973)).  The Ninth Circuit considers the following five factors in determining

9     whether a person has freely consented to a search:  (1) whether the defendant was in custody; (2)

10    whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given;

11    (4) whether the defendant was told that he had the right not to consent; and (5) whether the

12    defendant was told that a search warrant could be obtained."  *Id*.  When viewing the surrounding

13    circumstances, however, there is no "mechanized formula to resolve the voluntariness inquiry,"

14    and no one factor is dispositive.  *United States v. Patayan Soraino*, 361 F.3d 494, 502 (9th Cir.

15    2004).

16         Applying these factors to this case, the court finds Diaz-Flores freely and voluntarily

17    consented to the search.  He was not in custody at the time he was verbally asked, agreed, and

18    then consented in writing.  The officers did not have their guns drawn at any point during the

19    encounter.  *Miranda* warnings were not given to him, but were not required.  No suggestion was

20    made by the officers that his arrest was imminent, or that the officers were even considering

21    arresting him.  The written form, which was read to Diaz-Flores verbatim, advised him that he

22    had the right not to consent.  After Mermini read the form to him, Mermini asked Diaz to sign *if*

23    he consented to the search.  At no point during the encounter was Diaz-Flores told that a search

24    warrant could be obtained if he declined to consent.

25         The written motion claimed that the consent was not valid, among other reasons, because

26    Diaz-Florez is not a native English speaker, and the form was in English.  However, both officers

27    testified that they communicated with Diaz-Flores throughout the encounter in English, and had

28    no difficulty communicating with him.  The court found their testimony credible in this regard.

1  The audio portions of the dash-cam video confirm that all of the conversation between Diaz-

2  Flores and Officer Mermini were in English, and none of the audio portions of the recordings

3  support a finding that Diaz-Flores had difficulty understanding or communicating in English.

4      Diaz-Flores also argues that his consent was tainted by a prior Fourth Amendment

5  violation.  For Fourth Amendment purposes a determination that a consent is voluntary "only

6  satisfies a threshold requirement."  *United States v. George,* 883 F.2d 1407, 1415 (9th Cir. 1989).

7  A voluntary consent can be tainted by a prior Fourth Amendment violation.  *United States v.*

8  *Furrow,* 229 F.3d 805, 813 (9th Cir. 2000) (citing *United States v. Delgadillo-Velasquez,* 856

9  F.2d 1292, 1299 (9th Cir. 1988)).

10      The court has found that the initial traffic stop was based on reasonable suspicion, and the

11  scope and duration of the stop comported with the Fourth Amendment under the totality of the

12  circumstances.  It was objectively reasonable for Mermini to run a records check to determine

13  whether the vehicle had been stolen, and confirm Diaz-Flres identity and whether he had any

14  outstanding warrants.. As soon as Mermini confirmed the vehicle had not been reported stolen,

15  Diaz-Flores was given his paperwork, warned and told he was free to leave.  No Fourth

16  Amendment violation tainted the verbal and written consent Diaz-Flores gave.

17  **CONCLUSION**

18      The traffic stop was supported by reasonable suspicion to believe that Diaz-Flores had

19  violated NRS 484B.127.  The scope and duration of the stop were objectively reasonable under

20  the totality of the circumstances.  The government has met its burden of establishing that Diaz-

21  Flores voluntarily consented to a search of the vehicle.

22      For the reasons stated,

23      **IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth

24  Amendment Violations (Dkt. #17) be **DENIED.**

25      Dated this 25th day of August, 2015.

26

27                                                                PEGGY A. LEEN

28                                                UNITED STATES MAGISTRATE JUDGE